## CIRCUIT COURT OF THE CITY OF PORTSMOUTH

Randall E. Appleton
and Randall E. Appleton,
Attorney at Law, P.L.L.C.

v.

Bondurant & Appleton, P.C.,
and Bondurant Law, P.C.

February 28, 2005

Case No. (Law) 04-1106

BY JUDGE MARK S. DAVIS

This matter is before the Court on the Motion for Summary Judgment of defendants Bondurant & Appleton, P.C., and Bondurant Law, P.C. (hereafter sometimes "Bondurant"). The factual and procedural background of this matter, discussion of the issues, and conclusions are set forth below.

*I. Factual and Procedural Background*

*A. Motion for Judgment*

Plaintiffs Randall E. Appleton and Randall E. Appleton, Attorney at Law, P.L.L.C. (hereafter sometimes "Appleton") filed the motion for judgment against Bondurant in this matter on May 28, 2004.[1] Appleton's motion for judgment alleges that Bondurant & Appleton, P.C., was a law firm in existence from 1999 until March 2004, at which time Bondurant Law, P.C., was established as a successor firm to Bondurant & Appleton, P.C. Appleton

---

[1] Plaintiff Appleton is represented by Charles M. Lollar, Esq., of Tanner, Mulkey, Gordon & Lollar, P.C., and defendant Bondurant is represented by William D. Bayliss, Esq., of Williams Mullen, P.C.

also alleged that on July 12, 1999, Bondurant & Appleton, P.C., hired Appleton, pursuant to an oral agreement, to work as an attorney providing personal injury representation to clients of Bondurant with contingent fee arrangements. Appleton claims that the oral agreement between himself and Bondurant provided that Bondurant was to pay him 40% of the firm's net proceeds and that, while he was paid in August 2003 and January 2004, Bondurant "failed to adequately compensate Appleton for services rendered and proceeds realized by the firm during the 2003 and 2004 calendar years in accordance with the . . . oral agreement."

Appleton went on to allege that he "resigned his employment" with Bondurant in February 2004 and that the firm changed its name to Bondurant Law, P.C., while he established the new law firm of Randall E. Appleton, Attorney at Law, P.L.L.C. Appleton asserts that some clients "obtained representation from" the Bondurant firm, while others "obtained representation from" the Appleton firm. Appleton alleges a breach of contract claim in Count I, asserting entitlement to recover from Bondurant "a sum" which "is to be calculated based on client matters that were successfully concluded prior to the time of Appleton's resignation from Bondurant & Appleton, P.C." In Count II, Appleton seeks recovery in "implied contract or *quantum meruit*," asserting that he is "entitled to recover from [both defendants] a sum to be proved at trial for work performed on client matters that were not concluded as of the date on which Appleton resigned his employment at Bondurant & Appleton, P.C., and such clients having elected to obtain representation at Bondurant Law, P.C." Finally, in Count III, Appleton seeks a declaratory judgment, pursuant to Va. Code § 8.01-184, as to whether Bondurant is entitled to assert an attorney's lien on "each and every case that was solicited by Mr. Appleton and left the Firm." Appleton concluded by seeking judgment against Bondurant in the amount of $350,000.00 plus interest, costs, and attorney's fees and by asking the court to declare the attorney's lien asserted by Bondurant to be null and void and to declare the rights of the parties regarding such liens.

### B. Demurrer, Grounds of Defense, Counterclaim

Bondurant filed a demurrer asserting that the motion for judgment failed to state a claim for breach of contract or implied contract/*quantum meruit*. Bondurant also filed a grounds of defense generally denying most of the allegations in the motion for judgment and asserting that Mr. "Appleton was an at-will employee who came to work for Bondurant & Appleton, P.C., in 1989 rather than 1999" and stating that "Bondurant Law does admit that

Appleton had no written contract and simply was an at-will employee of the professional corporation, who was compensated pursuant to direction from the Board of Directors of the Professional Corporation." Bondurant further asserts that Mr. Appleton "represented clients of the law firm at the direction of Walton Bondurant, President and sole-owner of the Bondurant Law Firm." Bondurant also responded that Appleton resigned without notice, breaching his fiduciary duty to the firm by soliciting firm employees and clients prior to his departure, and thus forfeited any claim to damages. In response to the request for declaratory judgment, Bondurant replied that since Appleton was an at-will employee he "was not responsible for the debts and obligations of the law firm nor was he entitled to any more than his salary and upon leaving had no rights whatsoever to assert any claims against assets of the law firm including the value of the cases that remained at the law firm."

Bondurant also filed a counterclaim, alleging that "Walton Bondurant left the employment of Moody McMurren [sic] and Miller in 1979 to start his own firm and in 1989 Randall Appleton left the same Moody firm to join Miller and Bondurant as an at-will employee of that firm," voluntarily leaving Bondurant and Appleton, P.C. (successor to Miller & Bondurant, Ltd.) in February of 2004. Bondurant alleges that, after the retirement of Bernard Miller, Walton Bondurant was the sole shareholder, president, and director of Bondurant & Appleton, P.C., while Appleton remained an at-will employee of that firm without any written contract. Bondurant also alleges that the law firm (Bondurant & Appleton, P.C.) "held a meeting on October 1, 1999, at which time, a resolution of the Board of Directors was passed and executed by Walton G. Bondurant, Jr., President, Secretary, and Director of the corporation whereby the corporation agreed to pay annual salaries to the respective employees of the professional corporation including Randall Appleton." Bondurant further asserts that, pursuant to the resolution, "Appleton's salary was set at $75,000.00 and it was further resolved that the corporation, at the sole direction of the Board of Directors, shall pay bonuses above and beyond the salary limits as said above," with such resolution remaining in effect until Appleton left his employment in February 2004. Bondurant also asserts that "[i]t was understood between the parties that, when monies were available, that bonuses would be paid to Appleton which amounted to 40% of any excess money that the corporation had after the payment of its debts and obligations," such direction being "pursuant to the Board resolution of October 1, 1999, which allowed the Board of Directors to declare bonuses for Appleton at the Board's direction."

Bondurant's counterclaim also asserts that, "in 2003, Appleton's level of work dissipated and the firm began to suffer financial problems which culminated in a meeting on February 9, 2004, where Appleton complained that he was too

busy to keep up his cases and, at that meeting, Appleton suggested most of his significant personal injury cases be handled by other lawyers in the firm." Bondurant claims that, while Walton Bondurant was out of town on February 20, 2004, Randall E. Appleton informed him that he was "withdrawing from the firm" and then departed with his (Appleton's) secretary, as well as the firm's investigator and "key employee," Herbert Wooten.

Bondurant alleges that, prior to the Appleton departure, Mr. Appleton solicited employees and clients to depart the firm with him. Bondurant asserts a breach of fiduciary duty against Appleton in Count I, based upon the actions described above, and seeks $1,000,000.00 in damages, plus costs and attorney's fees. In Count II of the counterclaim, Bondurant asserts that "Appleton has chosen to tortiously interfere with the business and business expectancy of The Bondurant Law Firm by filing erroneous and illegal attorney's liens in all of the cases that remained at The Bondurant Law Firm, both in states where Appleton is licensed to do business and in states where Appleton is not licensed to do business." Bondurant asserts that such interference has caused economic damage to the firm and seeks $1,000,000.00 in damages, and $350,000.00 in punitive damages. In Count III, Bondurant asserts that Appleton misappropriated proprietary assets of Bondurant by continuing to utilize a "1-800" toll free telephone number obtained by Wooten some thirteen years ago and paid for by the law firm during that time. Bondurant seeks $350,000.00 in damages for such alleged misappropriation. In Count IV, Bondurant seeks a *quantum meruit* recovery, asserting that Bondurant is "entitled to be repaid all costs incurred in each case that Randall Appleton successfully solicited, as well as a portion of the fees in each case, based upon a fair *quantum meruit* basis to be determined by the Court on a case by case basis." Bondurant seeks at least $350,000.00 for this claim.

Appleton filed a demurrer and grounds of defense to Bondurant's counterclaim. Appleton admits that he left "the Moody firm in 1989 to join Miller and Bondurant as an at-will employee." Appleton also admitted that he was employed by Bondurant & Appleton, P.C., from 1999 to February 20, 2004, as an at-will employee pursuant to an oral agreement. Appleton denied that his salary was set at $75,000.00 and disclaimed any knowledge of a corporate resolution addressing his compensation. Appleton admitted that he, Herbert Wooten, and Becky Wyatt resigned their employment with Bondurant on February 20, 2004. Appleton also asserts that Wooten maintained a toll free telephone number at his residence and states that the telephone number belongs to Wooten. Appleton generally denied most of the other allegations in the counterclaim.

## C. Earlier Motions

The parties appeared before the Court on July 28, 2004, for argument on Plaintiff's Motion to Determine Validity of Attorney's Lien and Defendants' Motion to Determine Validity of Attorney's Lien. As reflected in an Order entered August 24, 2004, the Court found that attorney's liens asserted by Bondurant as to North Carolina cases retained by Appleton are invalid. The Court also found that attorney's liens asserted by Appleton as to cases retained by Bondurant are invalid.

The parties appeared before the Court again on August 24, 2004, on Defendant's Demurrer to Plaintiffs' Motion for Judgment and Plaintiffs' Motion to Compel complete responses by Defendants to Plaintiffs' Interrogatories and Requests for Production of Documents. The Court overruled defendants' demurrer, granted in part Plaintiff's Motion to Compel, and took under advisement the motion to compel with regard to Appleton's interrogatory number 7 seeking data to support Appleton's *quantum meruit* claim as to cases retained by Bondurant after Appleton's departure, but on which Appleton worked before his departure.

The parties appeared once again on September 22, 2004, on Appleton's Demurrer to Counts II and III of Bondurant's counterclaim. The Court overruled plaintiff's demurrer to Count II. The court sustained plaintiff's demurrer to Count III, with leave for Bondurant to amend. The Court also held that the attorney's liens filed by Bondurant as to Appleton's cases pending in Georgia and Kentucky, that were the subject of plaintiff's Motion to Determine Validity of Attorney's Liens, are valid liens under the law of Georgia and Kentucky.

The parties appeared again on December 22, 2004, and the Court overruled Appleton's demurrer to Bondurant's amended Count III and ordered Appleton to file responsive pleadings to such count. Since summary judgment as to Appleton's *quantum meruit* claim would make discovery on such claim unnecessary, the Court also again took under advisement Appleton's motion to compel an answer to plaintiffs interrogatory number 7, pending Bondurant's submission of a motion for summary judgment as to Appleton's *quantum meruit* claim. It is this motion for summary judgment that is presently before the Court for decision.

## II. Discussion

Bondurant filed a Motion for Summary Judgment on January 18, 2005, seeking dismissal of the *quantum meruit* claim contained in Count II of Appleton's Motion for Judgment. The Court will address the standard applicable to such motion, the contentions of the parties, and the merits of Appleton's *quantum meruit* claim.

## A. Standard for Consideration

Rule 3:18 of the Rules of the Supreme Court of Virginia provides that "[i]f it appears from the pleadings, the orders, if any, made at a pretrial conference, the admissions, if any, in the proceedings, or, upon sustaining a motion to strike the evidence, that the moving party is entitled to judgment, the court shall enter judgment in his favor." The rule also provides that "[s]ummary judgment shall not be entered if any material fact is genuinely in dispute." Va. Sup. Ct. R. 3:18 was adopted to provide trial courts with authority to bring litigation to an end at an early stage, when it clearly appears that one of the parties is entitled to judgment within the framework of the case as made out. *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 5-6, 82 S.E.2d 588, 590-91 (1954). Its purpose is to expedite litigation with as few technicalities as possible and thus avoid common-law procedural tactics interposed for delay, but the rule is not intended to substitute a new method of trial where an issue of fact exists. *Id.* Furthermore, in considering a motion for summary judgment, the Court must adopt those inferences from the facts that are most favorable to the nonmoving party, unless the inferences are strained, forced, or contrary to reason. *Carson ex rel. Meredith v. LeBlanc*, 245 Va. 135, 139-40, 427 S.E.2d 189, 192 (1993).

## B. Contentions of the Parties

In Count II of his Motion for Judgment, Appleton seeks compensation for his work on client matters that were not concluded as of the date he withdrew from Bondurant & Appleton, P.C. Appleton contends that he entered into an oral contract with Bondurant and such contract promised him 40% of the firm's net proceeds and that such oral contract only applied to fees generated on all cases completed prior to Appleton's departure from the old firm. Appleton claims that this oral contract did not address compensation with respect to cases that were not concluded at the time when he departed from the old firm because there would be no fee to apportion and he is therefore entitled to recovery on a *quantum meruit* theory for work he performed on cases that were not concluded prior to his departure from Bondurant and that did not transfer to Appleton. It was for this reason that Appleton sought discovery of all client matters that he worked on but which

remained at Bondurant after his departure.[2] Appleton summarizes his argument as follows: "Where, as here, Plaintiff Appleton's employment at Bondurant & Appleton, P.C., induced him to deliver services for which his contract failed to fix a definite compensation, the cases on which he worked but the fee was generated subsequent to his departure, the Court should employ principles of *quantum meruit* in order to achieve fairness and make Mr. Appleton whole." Appleton asserts that such a *quantum meruit* claim is evaluated according to the *Howard* factors contained in *Hughes v. Cole*, 251 Va. 3, 23-25, 465 S.E.2d 820, 833 (1996) (citing *County of Campbell v. Howard*, 133 Va. 19, 51, 112 S.E. 876, 885 (1922)). Supplemental Brief in Support of Motion to Compel, August 20, 2004, pp. 2-3; Supplemental Brief in Support of Plaintiff's Motion to Compel, December 8, 2004, pp. 3-5.

Bondurant contends in its brief in support of summary judgment that "[n]o matter what determination is made regarding the nature of Appleton's employment arrangement, Appleton's voluntary departure from the law firm to establish his own competing law practice results in a loss of any expectancy he might have had in a share of unrealized contingency fee payments." Bondurant asserts that this is so because Appleton was either a salaried at-will employee (as Bondurant alleges) or a contractual at-will employee (as Appleton alleges) and that, under each scenario, Appleton is precluded from seeking *quantum meruit* recovery. Bondurant asserts that *Wainger v. Glasser & Glasser*, 250 Va. 220, 462 S.E.2d 62 (1995), supports that position. Motion for Summary Judgment and Brief in Support Thereof, pp. 5-7.

## C. Quantum Meruit

In *Unidyne Corp. v. Aerolineas Argentinas*, 590 F. Supp. 391, 397 (E.D. Va. 1984), the court summarized the Virginia cases addressing the *quantum meruit* doctrine in Virginia, noting that:

> Ordinarily, when one person renders services for another which are requested and accepted by him, the law creates an obligation, called an implied-in-law contract, on his part to pay a reasonable compensation, unless something in the relationship of the parties

---

[2] Appleton notes that interrogatory number 7 seeks information regarding all cases at Bondurant which settled between January 1, 2004, and his departure (not just cases on which he worked during that period), such information being necessary for proof of his breach of contract claim.

indicates otherwise. *Burke v. Gale*, 193 Va. 130, 67 S.E.2d 917, 919 (1951). The crux of a *quantum meruit* cause of action lies in the unjust enrichment of one party. *Kern v. Freed Co.*, 224 Va. 678, 299 S.E.2d 363, 363-64 (1983). Merely rendering services alone does not create a contract implied-in-law, nor is such a contract implied when one officiously confers benefits upon another. *Weitzel v. Brown-Neil Corp.*, 152 F. Supp. 540, 549 (N.D. W. Va. 1957); *United States v. Lias*, 154 F. Supp. 955, 958 (N.D. W. Va. 1957). Further, even though the defendant may have benefited from the plaintiff's services, the latter cannot recover unless he can show sufficient additional facts that imply a promise to pay. *Mullins v. Mingo Lime Co.*, 176 Va. 44, 10 S.E.2d 492, 494-95 (1940).

Justice Keenan also commented on the application of *quantum meruit* in *Po River Water & Sewer v. Indian Acres Club*, 255 Va. 108, 114, 495 S.E.2d 478, 482 (1998):

> To avoid unjust enrichment, equity will effect a "contract implied in law," requiring one who accepts and receives the services of another to make reasonable compensation for those services. *See Marine Dev. Corp. v. Rodak*, 225 Va. 137, 142-44, 300 S.E.2d 763, 765-66 (1983); *Ricks v. Sumler*, 179 Va. 571, 577, 19 S.E.2d 889, 891 (1942); *Hendrickson v. Meredith*, 161 Va. 193, 200, 170 S.E. 602, 605 (1933). The liability to pay for the services is based on an implication of law that arises from the facts and circumstances presented, independent of agreement or presumed intention. *Marine Dev. Corp.*, 225 Va. at 142, 300 S.E.2d at 766; *Hendrickson*, 161 Va. at 200-01, 170 S.E. at 605. The promise to pay is implied from the consideration received.

*Id.*

Logic dictates, however, that "an express contract defining the rights of the parties necessarily precludes the existence of an implied contract of a different nature *containing the same subject matter*." (Emphasis added.) *Southern Biscuit Co. v. Lloyd*, 174 Va. 299, 311, 6 S.E.2d 601, 606 (1940); *see also Marine Development Corp. v. Rodak*, 225 Va. 137, 142-43, 300 S.E.2d 763, 767 (1983). Thus, where a contract exists, but the plaintiff alleges that the work for which it seeks recovery was not the subject of such contract, an action for unjust enrichment

seeking *quantum meruit* recovery is appropriate. *See Hitachi Systems Corp. v. webMethods, Inc.*, 60 Va. Cir. 79, 86 (Fairfax 2002).

This Court has found no decision of a Virginia court addressing the exact situation presented here. However, a somewhat similar scenario was addressed in *Marks & Harrison v. Nathanson*, 48 Va. Cir. 407 (Richmond 1999). In *Marks & Harrison*, Nathanson was employed by a law firm under a written contract which provided that, if her employment ceased for any reason and she retained any clients of the firm, she would promptly refund to the firm any costs advance by the firm on behalf of such clients and pay a portion of any contingent fees collected. Nathanson did resign and 65 former clients of the firm elected to be represented by her. The firm sought payment of such costs, and Nathanson replied that the costs provision was unenforceable because it violated the disciplinary rules applicable to Virginia attorneys and that it was contrary to public policy. She also argued that the sliding scale, established for a portion of the contingency fee to be paid to the firm after Nathanson's departure, constituted fee splitting under the disciplinary rules.

The *Marks & Harrison* court found that neither the costs provision nor the escalating fee provision violated the disciplinary rules. In analyzing the fee provision of the contract, the *Marks & Harrison* court looked to Legal Ethics Opinion 1556 of the Opinions of the Standing Committee on Legal Ethics. 1994 Va. Legal Ethics Ops. LEXIS 47 (1994).[3] In L.E.O. 1556, the Committee was asked to comment, among other things, on provisions of employment/shareholder/partnership agreements between lawyers and law firms whereby "the law firm is obligated to pay withdrawing lawyers some portion of fees received for their unbilled work or work in progress existing at the time of withdrawal." *Id.* at *1. Looking to Disciplinary Rule (DR) 2-105(D) addressing the division of fees among lawyers not in the same firm, the court noted that "[t]hough a lawyer who has withdrawn is no longer in the firm, his unbilled work and work in progress existing at the time of withdrawal were produced while he was in the firm" and "[t]he fees attributable to such work, though received by the firm after his withdrawal, had been earned for services rendered as a member of the firm before his

---

[3] Virginia State Bar Legal Ethics Opinions are "advisory only" and "not binding on any Court or tribunal." Va. Code Ann., LEO and UPL App. at 138 (2002 Repl. Vol.); *Dulles Corner Properties II, L.P. v. Smith*, 38 Va. Cir. 507, 510 (Fairfax 1992). However, "they are instructive and assist the Court in construing the meaning of the Disciplinary Rules and Ethical Considerations contained in the Virginia Code of Professional Responsibility." *Smith v. Ramey*, 21 Va. Cir. 537, 539 (Tazewell 1988).

withdrawal." *Marks & Harrison*, 48 Va. Cir. at 412. Applying this reasoning (which applies in both contractual and non-contractual contexts) to the firm's request to be paid for services it rendered prior to Nathanson's withdrawal, the court stated that "*[j]ust as Nathanson would be entitled to receive compensation for work that she provided to the firm prior to her withdrawal,* the firm is also entitled to be compensated for its work." *Marks & Harrison*, 48 Va. Cir. at 412 (emphasis added).[4] While this analysis took place in the context of a contract specifically addressing work in progress at the time of departure, the analysis is helpful because it recognizes that, absent an agreement providing otherwise, an attorney who departs a law firm is entitled to be compensated for work that she provided the firm prior to her departure, just as the firm is entitled to be compensated for work it performed on cases that left with the departing attorney (at the request of the clients). The question remains, however, whether there is an agreement otherwise in this case.

Other courts have addressed the application of the *quantum meruit* doctrine in situations similar to that presently before the Court. In *Caras v. Green*, 1996 Ohio App. LEXIS 3162 (1996), an associate in a law firm filed a complaint against his firm claiming that he was a partner in the firm and that the law firm had deprived him of profits to which he was entitled. In his complaint, the associate alleged breach of contract, asserting that "an oral contract of partnership governed the amount of compensation he was due, and that, as a 40% equity partner, he was entitled to recover a share of fees earned by the firm, including those receivables which had not yet been billed or collected by the firm at the time of his resignation." Furthermore, in "his unjust enrichment claim, [the associate] sought a share of fees from cases on which he had worked *while at [the firm] but which had not yet been billed or collected at the time of his resignation.*" (Emphasis added.) The Ohio Court of Appeals held that:

> The subject of both of these claims was Caras' right to compensation and the amount thereof on his departure from the firm. In short, Caras' breach of contract claim and the basis for his unjust enrichment claim overlapped. Caras was not entitled to have the jury consider his unjust

---

[4] It should be noted that, as recognized in Virginia L.E.O. 1760, where a court orders the splitting of fees as proper compensation for attorneys, it is not necessary for such attorneys to obtain permission from their clients to effect such court-ordered fee splitting.

enrichment claim while simultaneously considering his breach of contract claim. The two are mutually exclusive.

The pleadings and the evidence, construed most strongly in favor of Caras, clearly demonstrate that any right that Caras had to compensation from Green & Green for the period and services in question derives from a contract between them, either a contract of employment or a partnership agreement. The fact that the two contracts are independent does not compel a conclusion that there was a temporal or legal hiatus between them in which the Defendants were unjustly enriched at Caras' expense. On this record, if a partnership agreement was entered into, it succeeded directly on the employment contract, which was extinguished by the partnership agreement if there was one, or by Caras' resignation from the firm if there was not. Therefore, the court erred when it instructed the jury that it could find in Caras' favor on his claim of unjust enrichment.

*Id.* at *11.

Unlike *Caras*, Appleton here alleges a breach of contract claim *and* an unjust enrichment claim for *quantum meruit* recovery that do not overlap. In *Caras*, the breach of contract claim covered fees that had not yet been earned but which flowed in part from files on which he had worked before his departure. In the present case, Appleton asserts that his oral contract only applied to cases concluded before his departure, and that there was no agreement regarding compensation for his work on cases that were not concluded prior to his departure from the firm. It is that work for which he asserts an unjust enrichment claim seeking *quantum meruit* recovery.

Bondurant asserts facts different from those asserted by Appleton. Bondurant contends that Appleton was paid a salary of $75,000.00 (presumably annually) and received bonuses at the sole discretion of the Board of Directors. Bondurant also asserts that *Wainger v. Glasser & Glasser*, 250 Va. 220, 462 S.E.2d 62 (1995), stands for the proposition that "the contingency fees are not earned until payment is effected," and that "[w]here, as here, payment has not occurred before the attorney (Appleton) has voluntarily departed the law firm, there is no claim to fees later earned through contingency." However, as Appleton points out, the provision applied in *Wainger* was a bargained-for provision of the contract and it was binding upon the parties only to the extent that it represented the contract between them. If Bondurant is correct in his assertion that Appleton was solely an at-will salaried employee, then Appleton should not be able to recover for unjust enrichment because the payment of a salary represents payment for work

performed during the term of such employment, unless an agreement provides otherwise.[5] Bondurant also asserts that denial of his summary judgment motion would create havoc for law firms whose associates depart then seek *quantum meruit* recovery for their work in progress.[6] However, the fact that an attorney is paid a salary from the moment of hire undercuts any suggestion that he could leave a firm and make an unjust enrichment claim (absent such an agreement) as to cases he worked on prior to his departure but which were concluded after his departure. Furthermore, any suggestion by an attorney that he was entitled to his flat periodic salary, *plus* an unjust enrichment recovery after his departure for cases not yet concluded, is in effect the kind of prohibited fee splitting discussed in *Marks & Harrison* where contracts provided for fees to be paid to the former firm for years past the departure of the attorney and wholly out of proportion to work actually performed. *Marks & Harrison*, 48 Va. Cir. at 413-14.

The finder of fact will have to decide, among other things, whether there was an oral contract as Appleton alleges, or a salary plus bonus arrangement as Bondurant alleges; whether such salary and bonus arrangement as Bondurant alleges (if it existed) addressed compensation for cases that were not concluded upon Appleton's departure; whether such oral contract as Appleton alleges (if it existed) covered cases that were not concluded upon Appleton's departure such that he lost the right to compensation for such unconcluded work; and, if there was an oral contract as Appleton alleges, what compensation is Appleton entitled to receive under the unjust enrichment claim for *quantum meruit* recovery.[7] There is obviously a disagreement as to the arrangements for Appleton's compensation, and such disagreement will have to be decided by the finder of fact.[8] Because there is a

---

[5] Bondurant's assertion that it was understood by the parties that a 40% "bonus" would be paid *after* payment of the firm's debts and obligations, sounds like an oral contract for payment of bonuses. Nonetheless, even if the finder of fact determines such to be the case, it still leaves for determination whether such agreement encompasses payment for cases on which Appleton worked but which were concluded after his departure.

[6] While the Court indicated at oral argument that it was concerned about the possibility of departing attorneys seeking *quantum meruit* relief where they have been otherwise compensated, the determination of whether they have been otherwise compensated is a question of fact that this Court cannot prematurely remove from the fact-finder.

[7] It is also possible that the fact-finder, if it believes an arrangement existed as asserted by Bondurant, will have to determine whether contractual bonus compensation is due and/or whether *quantum meruit* compensation is due. *See Jackson v. Ford*, 252 Ga. 304, 306, 555 S.E.2d 143, 147 (2001) (amount of compensation must be definite or objectively ascertainable from the promise made).

material fact genuinely in dispute, this Court cannot grant summary judgment in favor of Bondurant.

## IV. Conclusion

Bondurant's motion for summary judgment is denied for the reasons set forth above. The briefs addressing the motions decided in this Opinion and Order are ordered filed. The objections to this Opinion and Order, as stated in the pleadings and briefs and at oral argument on the record, are preserved and exceptions are noted on such basis. The Court therefore dispenses with the Rule 1:13 counsel endorsement requirement. It is so ordered.

---

[8] If it is determined that a *quantum meruit* award is appropriate, the factors that the Court must consider in making such a *quantum meruit* award are clear, *Hughes v. Cole*, 251 Va. 3, 25, 465 S.E.2d 820, 834 (1996), though the method in which those factors are applied is generally left to the court's discretion. *E.g., Watson v. Peterson*, 650 N.W.2d 562 (Iowa 2002); *Haynes v. Dalton*, 848 S.W.2d 664 (Tenn. 1992).